## MOORE *v.* ROBBINS.

1. A patent for public land, when issued by the Land Department, acting within the scope of its authority, and delivered to and accepted by the grantee, passes the legal title to the land. All control of the Executive Department of the government over the title thereafter ceases.

2. If there be any lawful reason why the patent should be cancelled or rescinded, the appropriate remedy is by a bill in chancery, brought by the United States, but no executive officer is authorized to reconsider the facts on which it was issued, and to recall or rescind it, or to issue one to another party for the same tract.

3. But when fraud or mistake or misconstruction of the law of the case exists, the United States, or any contesting claimant for the land, may have relief in a court of equity.

4. Under sect. 14 of the act of 1841 (5 Stat. 457), and the act of March 3, 1853 (10 id. 244), no pre-emption claim was of any avail against a purchaser of the land at the public sales ordered by the proclamation of the President, unless, before they commenced, the claimant had proved up his settlement and paid for the land.

5. The decision of the Secretary of the Interior, against a purchaser at the public sales, in favor of a pre-emption claimant who had failed to make the required proof and payment, was erroneous, as a misconception of the law, and the equitable title should be decreed to belong to the purchaser

ERROR to the Supreme Court of the State of Illinois. The facts are stated in the opinion of the court.

*Mr. Philip Phillips* for the plaintiff in error.
*Mr. R. E. Williams, contra.*

MR. JUSTICE MILLER delivered the opinion of the court.

This case is brought before us by a writ of error to the Supreme Court of the State of Illinois.

In its inception, it was a bill in the Circuit Court for De Witt County, to foreclose a mortgage given by Thomas I. Bunn to his brother Lewis Bunn, on the south half of the south-east quarter and the south half of the south-west quarter of section 27, township 19, range 3 east, in said county. In the progress of the case, the bill was amended so as to allege that C. H. Moore and David Davis set up some claim to the land; and they were made defendants, and answered.

Moore said that he was the rightful owner of forty acres of the land mentioned in the bill and mortgage, to wit, the south-west

quarter of the south-west quarter of said section, and had the patent of the United States giving him the title to it.

Davis answered that he was the rightful owner of the south-east quarter of said south-west quarter of section 27. He alleges that John P. Mitchell bought the land at the public sale of lands ordered by the President for that district, and paid for it, and had the receipt of the register and receiver, and that it was afterwards sold under a valid judgment and execution against Mitchell, and the title of said Mitchell came by due course of conveyance to him, said Davis.

It will thus be seen, that, while Moore and Davis each assert title to a different forty acres of the land covered by Bunn's mortgage to his brother, neither of them claim under or in privity with Bunn's title, but adversely to it.

But as both parties assert a right to the land under purchases from the United States, and since their rights depend upon the laws of the United States concerning the sale of its public lands, there is a question of which this court must take cognizance.

As regards Moore's branch of the case, it seems to us free from difficulty.

The evidence shows that the forty acres which he claims was struck off to him at a cent or two over $2.50 per acre, at a public land sale, by the officers of the land district at Danville, Ill., Nov. 15, 1855; that his right to it was contested before the register and receiver by Bunn, who set up a prior pre-emption right. Those officers decided in favor of Bunn; whereupon Moore appealed to the Commissioner of the General Land-Office, who reversed the decision of the register and receiver, and on this decision a patent for the land was issued to Moore, who has it now in his possession.

Some time after this patent was delivered to Moore, Bunn appealed from the decision of the commissioner to the Secretary of the Interior, who reversed the commissioner's decision and confirmed that of the register and receiver, and directed the patent to Moore to be recalled, and one to issue to Bunn. But Moore refused to return his patent, and the Land Department did not venture to issue another for the same land; and so there is no question but that Moore is vested now with the legal title

to the land, and was long before this suit was commenced. Nor is there, in looking at the testimony taken before the register and receiver and that taken in the present suit, any just foundation for Bunn's pre-emption claim. We will consider this point more fully when we come to the Davis branch of the case.

Taking this for granted, it follows that Moore, who has the legal title, is in a suit in chancery decreed to give it up in favor of one who has neither a legal nor an equitable title to the land.

The Supreme Court of Illinois, before whom it was not pretended that Bunn had proved his right to a pre-emption, in their opinion in this case place the decree by which they held Bunn's title paramount to that of Moore on the ground that to the officers of the Land Department, including the Secretary of the Interior, the acts of Congress had confided the determination of this class of cases; and the decision of the secretary in favor of Bunn, being the latest and the final authoritative decision of the tribunal having jurisdiction of the contest, the courts are bound by it, and must give effect to it. *Robbins* v. *Bunn,* 54 Ill. 48.

Without now inquiring into the nature and extent of the doctrine referred to by the Illinois court, it is very clear to us that it has no application to Moore's case. While conceding for the present, to the fullest extent, that when there is a question of contested right between private parties to receive from the United States a patent for any part of the public land, it belongs to the head of the Land Department to decide that question, it is equally clear that when the patent has been awarded to one of the contestants, and has been issued, delivered, and accepted, all right to control the title or to decide on the right to the title has passed from the land-office. Not only has it passed from the land-office, but it has passed from the Executive Department of the government. A moment's consideration will show that this must, in the nature of things, be so. We are speaking now of a case in which the officers of the department have acted within the scope of their authority The offices of register and receiver and commissioner are created mainly for the purpose of supervising the sales of the public

lands; and it is a part of their daily business to decide when a party has by purchase, by pre-emption, or by any other recognized mode, established a right to receive from the government a title to any part of the public domain. This decision is subject to an appeal to the secretary, if taken in time. But if no such appeal be taken, and the patent issued under the seal of the United States, and signed by the President, is delivered to and accepted by the party, the title of the government passes with this delivery. With the title passes away all authority or control of the Executive Department over the land, and over the title which it has conveyed. It would be as reasonable to hold that any private owner of land who has conveyed it to another can, of his own volition, recall, cancel, or annul the instrument which he has made and delivered. If fraud, mistake, error, or wrong has been done, the courts of justice present the only remedy. These courts are as open to the United States to sue for the cancellation of the deed or reconveyance of the land as to individuals; and if the government is the party injured, this is the proper course.

"A patent," says the court in *United States* v. *Stone* (2 Wall. 525), "is the highest evidence of title, and is conclusive against the government and all claiming under junior patents or titles, until it is set aside or annulled by some judicial tribunal. In England, this was originally done by *scire facias*; but a bill in chancery is found a more convenient remedy." See also *Hughes* v. *United States*, 4 Wall. 232; s. c. 11 How. 552.

If an individual setting up claim to the land has been injured, he may, under circumstances presently to be considered, have his remedy against the party who has wrongfully obtained the title which should have gone to him.

But in all this there is no place for the further control of the Executive Department over the title. The functions of that department necessarily cease when the title has passed from the government. And the title does so pass in every instance where, under the decisions of the officers having authority in the matter, a conveyance, generally called a patent, has been signed by the President, and sealed, and delivered to and accepted by the grantee. It is a matter of course that, after this is done, neither the secretary nor any other executive officer

can entertain an appeal. He is absolutely without authority. If this were not so, the titles derived from the United States, instead of being the safe and assured evidence of ownership which they are generally supposed to be, would be always subject to the fluctuating, and in many cases unreliable, action of the land-office. No man could buy of the grantee with safety, because he could only convey subject to the right of the officers of the government to annul his title.

If such a power exists, when does it cease? There is no statute of limitations against the government; and if this right to reconsider and annul a patent after it has once become perfect exists in the Executive Department, it can be exercised at any time, however remote. It is needless to pursue the subject further. The existence of any such power in the Land Department is utterly inconsistent with the universal principle on which the right of private property is founded.

The order of the Secretary of the Interior, therefore, in Moore's case, was made without authority, and is utterly void, and he has a title perfect both at law and in equity.

The question presented by the forty acres claimed by Davis is a very different one. Here, although the government has twice sold the land to different persons and received the money, it has issued no patent to either, and the legal title remains in the United States. It is not denied, however, that to one or the other of the parties now before the court this title equitably belongs; and it is the purpose of the present suit to decide that question.

The evidence shows that on the same day that Moore bought at the public land sale the forty acres we have just been considering, Mitchell bought in like manner the forty acres now claimed by Davis; to wit, Nov. 15, 1855. He paid the sum at which it was struck off to him at public outcry, and received the usual certificate of purchase from the register and receiver. On the twentieth day of February, 1856, more than three months after Mitchell's purchase, Thomas I. Bunn appeared before the same register and receiver, and asserted a right, by reason of a pre-emption commenced on the eighth day of November, 1855, to pay for the south half of the south-west quarter and the south half of the south-east quarter of section 27, which includes both the land of Moore and Davis in controversy in

this suit, and to receive their certificates of purchase. They accepted his money and granted his certificate. A contest between Bunn on the one side, and Moore and Mitchell on the other, as to whether Bunn had made the necessary settlement, was decided by those officers in favor of Bunn; and on appeal, as we have already shown, to the commissioner, this was reversed, and finally the Secretary of the Interior, reversing the commissioner, decided in favor of Bunn. But no patent was issued to Mitchell after the commissioner's decision, as there was to Moore; and the secretary, therefore, had the authority, undoubtedly, to decide finally for the Land Department who was entitled to the patent. And, though no patent has been issued, that decision remains the authoritative judgment of the department as to who has the equitable right to the land.

The Supreme Court of Illinois, in their opinion in this case, come to the conclusion that this final decision of the secretary is not only conclusive on the department, but that it also excludes all inquiry by courts of justice into the right of the matter between the parties.

The whole question, however, has been since that time very fully reviewed and considered by this court in *Johnson* v. *Towsley*, 13 Wall. 72. The doctrine announced in that case, and repeated in several cases since, is this: —

That the decision of the officers of the Land Department, made within the scope of their authority on questions of this kind, is in general conclusive everywhere, except when reconsidered by way of appeal within that department; and that as to the facts on which their decision is based, in the absence of fraud or mistake, that decision is conclusive even in courts of justice, when the title afterwards comes in question. But that in this class of cases, as in all others, there exists in the courts of equity the jurisdiction to correct mistakes, to relieve against frauds and impositions, and in cases where it is clear that those officers have, by a mistake of the law, given to one man the land which on the undisputed facts belonged to another, to give appropriate relief.

In the recent case of *Shepley et al.* v. *Cowan et al.* (91 U. S. 340), the doctrine is thus aptly stated by Mr. Justice Field: "The officers of the Land Department are specially designated

by law to receive, consider, and pass upon proofs presented with respect to settlements upon the public lands, with a view to secure rights of pre-emption. If they err in the construction of the law applicable to any case, or if fraud is practised upon them, or they themselves are chargeable with fraudulent practices, their rulings may be reviewed and annulled by the courts when a controversy arises between private parties founded upon their decisions; but, for mere errors of judgment upon the weight of evidence in a contested case before them, the only remedy is by appeal from one officer to another of the department."

Applying to the case before us these principles, which are so well established and so well understood in this court as to need no further argument, we are of opinion, if we take as proved the sufficiency of the occupation and improvement of Bunn as of the date which he alleged, his claim is fatally defective in another respect in which the officers of the Land Department were mistaken as to the law which governed the rights of the parties, or entirely overlooked it.

In the recent case of *Atherton v. Fowler (supra,* p. 513), we had occasion to review the general policy and course of the government in disposing of the public lands, and we stated that it had formerly been, if it is not now, a rule of primary importance to secure to the government the highest price which the land would bring by offering it publicly at competitive sales, before a right to any part of it could be established by private sale or by pre-emption. In the enforcement of this policy, the act of Sept. 14, 1841, which for the first time established the general principle of pre-emption, and which has remained the basis of that right to this day, while it allowed persons to make settlements on the public lands as soon as the surveys were completed and filed in the local offices, affixed to such a settlement two conditions as affecting the right to a pre-emption. One of these was that the settler should give notice to the land-office of the district, within thirty days after settlement, of his intention to exercise the right of pre-emption, and the other we will give in the language of the fourteenth section of that act: —

" This act shall not delay the sale of any of the public lands of the United States beyond the time which has been or may be appointed by the proclamation of the President, nor shall any of the provi-

sions of this act be available to any person who shall fail to make the proof of payment and file the affidavit required, before the commencement of the sale aforesaid." ˙5 Stat. 457.

There can be no misconstruction of this provision, nor any doubt that it was the intention of Congress that none of the liberal provisions of that act should stand in the way of a sale at auction of any of the public lands of a given district where the purchase had not been completed by the payment of the price before the commencement of the sales ordered by the President's proclamation. We do not decide, because we have not found it necessary to do so, whether this provision is applicable under all the pre-emption laws passed since the act of 1841; though part of it is found in the Revised Statutes, sect. 2282, as part of the existing law. But we have so far examined all those laws enacted prior to November, 1855, the date of Mitchell's purchase, as to feel sure it was in full operation at that time. The act of March 3, 1853, extending the right of pre-emption to the alternate sections, which the government policy reserved in its numerous grants to railroads and other works of internal improvement, required the pre-emptor to pay for them at $2.50 per acre, before they should be offered for sale at public auction. ·10 Stat. 244. This was only two years and a half before these lands were sold to Mitchell, and they were parts of an alternate section reserved in a railroad grant. That statute, in its terms, was limited to persons who had already settled on such alternate sections, and it may be doubted whether any right of pre-emption by a settlement made afterwards existed under the law. But it is unnecessary to decide that point, as it is beyond dispute that it required in any event that the money should be paid before the land was offered for sale at public auction.

The record of this case shows that, while Bunn's pre-emption claim comes directly within the provision of both statutes, they were utterly disregarded in the decision of the Secretary of the Interior, on which alone his case has any foundation.

We have no evidence in this record at what time the President's proclamation was issued, or when the sales under it began at which Mitchell purchased. These proclamations are not published in the statutes as public laws, and this one is not

mentioned in the record. But we know that the public lands are never offered at public auction until after a proclamation fixing the day when and the place where the sales begin. The record shows that both Moore and Mitchell bought and paid for the respective forty-acre pieces now in contest, at public auction. That they were struck off to them a few cents in price above the minimum of $2.50, below which these alternate sections could not be sold, and that this was on the fifteenth day of November, 1855. These public sales were going on then on that day, and how much longer is not known, but it might have been a week, or two weeks, as these sales often continue open longer than that.

Bunn states in his application, made three months after this, that his settlement began on the 8th of November, 1855. It is not apparent from this record that he ever gave the notice of his intention to pre-empt the land, by filing what is called a declaration of that intention in the land-office. There is a copy of such a declaration in the record accompanying the affidavit of settlement, cultivation, and qualification required of a pre-emptor, which last paper was made and sworn to Feb. 20, 1856, when he proved up his claim, and paid for and received his certificate. There is nothing to show when the declaration of intention was filed in the office.

Waiving this, however, which is a little obscure in the record, it is very clear that Bunn " failed to make proof of payment, and failed to file the affidavit of settlement required, before the commencement of the sale " at which Mitchell bought. The statute declares that none of the provisions of the act shall be available to any person who fails to do this. The affidavit and payment of Bunn were made three months after the land sales had commenced, and after these lands had been sold.

The section also declares that the act shall not delay the sale of any public land beyond the time which has been or may be appointed by the proclamation of the President. To refuse Mitchell's bid on account of any supposed settlement, even if it had been brought to the attention of the officers, would have been to delay the sale beyond the time appointed, and would, therefore, have been in violation of the very statute under which Bunn asserts his right.

Whatever Bunn may have done on the 8th of November, and up to the 15th of that month, in the way of occupation, settlement, improvement, and even notice, could not withdraw the land from sale at public auction, unless he had also paid or offered to pay the price before the sales commenced.

It seems quite probable that such attempt at settlement as he did make was made while the land sales were going on, or a few days before they began, with the purpose of preventing the sale, in ignorance of the provision of the statute which made such attempt ineffectual.

At all events, we are entirely satisfied that the lands in controversy were subject to sale at public auction at the time Moore and Mitchell bid for and bought them; that the sale so made was by law a valid one, vesting in them the equitable title, with right to receive the patents; and that the subsequent proceedings of Bunn to enter the land as a pre-emptor were unlawful and void.

It was the duty of the court in Illinois, sitting as a court of equity, to have declared that the mortgage made by Bunn, so far as these lands are concerned, created no lien on them, because he had no right, legal or equitable, to them.

The decree of the Supreme Court of that State must be reversed, and the cause remanded to that court for further proceedings in accordance with this opinion; and it is

*So ordered.*