REYNA, Circuit Judge,
dissenting from denial of initial hearing en banc.
Cascades petitions this court to address en banc the exceptionally important question of whether the United States Constitution prohibits the Patent Trial and Appeal Board from canceling patents through its inter partes review process. I would grant Cascades’ petition and respectfully dissent from today’s order to the contrary.
The state of current law compels en banc review. First, undisturbed Supreme Court precedent addresses the question at hand: “The only authority competent to set a patent aside, or to annul it, or to correct it for any reason whatever, is vested in the courts of the United States, and not in the department which issued the patent.” McCormick Harvesting Mach. Co. v. C. Aultman & Co., 169 U.S. 606, 609, 18 S.Ct. 443, 42 L.Ed. 875 (1898) (citation omitted).
Second, two inconsistent and irreconcilable Federal Circuit precedential opinions, which purport to distinguish McCormick, hold that the United States Patent and Trademark Office retains power to revoke, cancel, or annul any original patent it issues. McCormick was decided over a century ago. By contrast, the two Federal Circuit decisions and the America Invents Act, which gave birth to inter partes review, are much more recent.
Third, the separation of powers weighs in the balance. The core of this dispute involves substantial questions of property rights, Article III, and the Seventh Amendment. Thus, while this matter involves a significant question of federal patent law, its reach is beyond patent law. Specifically, we should consider the constraints Article III imposes on the adjudication of patent rights by an administrative authority. We should not ignore these important questions that lie at our doorstep.
To understand the relationship between patents, pertinent stakeholders, and these questions, we must first look at the circumstances that existed when the Patent Clause was made part of the Constitution. Hence, we start at the founding of our nation.
I. The Patent Clause
The Constitution empowers Congress “[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries.” U.S. Const, art. I, § 8, cl. 8. The Patent Clause is unique in several aspects. It grants Congress authority in such particularized detail to render the clause an imperative: to secure an exclusive right. And of the many clauses in Section 8, this is the only one to specify not only the ends (promotion of the progress of science and the useful arts) but the means (issuance of patents).
A. Patent Clause Debate
The simplicity of the language of the Patent Clause has obscured the underlying debate over time. There is no doubt that *1315 the link between patents and the promotion of “the Progress of Science and useful Arts” has proven prescient. Yet, consider that the Patent Clause came into being only after attempts to promote the progress of science and useful arts by the establishment of a national university failed. See Dotan Oliar, Making Sense of the Intellectual Property Clause: Promotion of Progress as a Limitation on Congress’s Intellectual Property Power, 94 Geo. L.J. 1771, 1792-94 (2006) (summarizing James Madison’s rejected proposal for a national university). While the draft text calling for a constitutional establishment of a national university was relegated to the debate dustbin, the phrase “[t]o promote the Progress of Science and useful Arts” was, much to Thomas Jefferson’s chagrin, rescued from the cutting room floor and combined with “by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries” to create the Patent Clause. See id. at 1776, 1804-05 (summarizing Jefferson’s opposition to the Patent Clause).
Indeed, what little debate there was on the Patent Clause was intense, substantive, and almost entirely focused on uncertainties about the creation of an exclusive right and its links to the establishment of a private monopoly. Madison was correct when he wrote that the utility of patents “will scarcely be questioned.” The Federalist No. 43, at 338 (James Madison) (John C. Hamilton ed., J. B. Lippincott & Co. 1804). Though the Framers generally disfavored monopolies, Madison argued that monopolies for “literary works and ingenious discoveries” are “too valuable” to be “wholly renounced.” 14 The Papers of Thomas Jefferson (Julian P. Boyd ed., 1956) (Oct. 17, 1788 letter from Madison to Jefferson). He believed that “[t]he right to useful inventions seems ... to belong to the inventors” because patents foster the public good. The Federalist No. 43, at 338 (James Madison). On the other side of the debate, Benjamin Franklin staunchly opposed monopolies, writing that “as we enjoy great advantages from the inventions of others, we should be glad of an opportunity to serve others by any invention of ours; and this we should do freely and generously.” Benjamin Franklin, 1 The Complete Works of Benjamin Franklin 223-24 (John Bigelow ed. 1887). Of course, not everyone would be so free and generous with their inventions without an opportunity to profit through a limited monopoly. Recognizing a tradeoff was required— promotion of free thought and creativity for the public, and a secured right for the inventor—the Framers unanimously voted to adopt the Patent Clause. In doing so, the Framers calmed the uncertainty about monopolies in clear, simple words: the Constitution granted Congress authority to create for a limited time a personal right of exclusivity. In my view, Congress was more than empowered to act—the American people spoke and told Congress to act in a specific and particularized way.
B. The Patent As A Private Property Right
At the time the Constitution went into effect, the patent was considered more than a public good and in brief time became a recognized property right. In eighteenth century America, patents were considered “privileges.” Adam Mossoff, Who Cares What Thomas Jefferson Thought About Patents? Reevaluating the Patent “Privilege” in Historical Context, 92 Cornell L. Rev. 953, 990 (2007) (“Mossoff’). At that time, “privileges” were “civil rights in property afforded expansive and liberal protection under the law.” Id. This civil property right, which the Constitution instructs Congress to “secur[e],” stands in stark contrast to the “grant” of patents in England. McKeever v. United States, 14 Ct.Cl. 396, 421 (1878) (“Congress are not empowered to grant to inventors a favor, *1316 but to secure to them a right.”); Mossoff at 991 (“Throughout the nineteenth century, courts reaffirmed their view of patents as civil rights on par with contract and property rights similarly identified as privileges.”).
That patents are property is now “beyond reasonable debate.” Patlex Corp. v. Mossinghoff, 758 F.2d 594, 599 (Fed. Cir. 1985); see Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank, 527 U.S. 627, 642, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999) (“Patents ... have long been considered a species of property”) (citation omitted); Ex parte Wood, 22 U.S. (9 Wheat.) 603, 608, 6 L.Ed. 171 (1824) (“The inventor has, during this period [of patent monopoly], a property in his inventions; a property which is often of very great value, and of which the law intended to give him the absolute enjoyment and possession.”); Robert Bosch LLC v. Pylon Mfg. Corp., 659 F.3d 1142, 1149 (Fed. Cir. 2011) (courts may not “entirely ignore the fundamental nature of patents as property rights granting the owner the right to exclude”); 35 U.S.C. § 261 (“[Patents shall have the attributes of personal property”).
The Supreme Court has long held the view that patents are private rights worthy of protection. See Grant v. Raymond, 31 U.S. (6 Pet.) 218, 222, 8 L.Ed. 376 (1832) (constitutional imperative to secure the “progress of useful arts” led the Supreme Court to endorse reissued patents before Congress ever provided statutory authority'to do so). Patent rights vest such that subsequent repeals of a patent statute cannot impact an issued patent. McClurg v. Kingsland, 42 U.S. (1 How.) 202, 206, 11 L.Ed. 102 (1843). And the'Supreme Court has warned this court to remember “the settled expectations of the inventing community.” Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 739, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002). Grant, McClurg, and Festo all show how patent' rights cannot be separated from any other type of property right. For as we have said previously, “[pjatent law is not an island separated from the main body of American jurisprudence.” Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., 383 F.3d 1337, 1351 (Fed. Cir. 2004) (en banc).
Amici lend support. They point out that “[s]ince the Antebellum Era in the early nineteenth century, the Supreme Court and Circuit Courts repeatedly and consistently defined patents as constitutionally protected private rights—specifically, as private property rights.” 13 Law Professors’ Amicus Curiae Brief at 2 (emphasis in original). As private property, patents are protected by the. Fifth Amendment against uncompensated government takings. See Horne v. Dep’t of Agriculture, — U.S. —, 135 S.Ct. 2419, 2427, 192 L.Ed.2d 388 (2015) (personal property, including patents, is not “any less protected against physical appropriation than real property”); James v. Campbell, 104 U.S. 356, 358, 26 L.Ed. 786 (1882) (“[A patent] confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation, any more than it can appropriate or use without compensation land which has been patented to a private purchaser... .”); 28 U.S.C. § 1498(a) (granting the United States Court of Federal •-Claims jurisdiction, to adjudicate patent infringement suits against the federal government under a takings theory).[1] And patents are protected against violations of due process pursuant to the Fourteenth Amendment. Fla. Prepaid, 527 U.S. at 642, 119 S.Ct. 2199 (“[Patents] are surely included within *1317 the ‘property' of which no person may be deprived by a State without due process of law.”).
The exclusive nature of the property right vested in patents has long been analogized to patents for land.[2] The Supreme Court has stated that a patent for an invention “is as much property as a patent for land,” and its rights “rest[] on the same foundation and [are] surrounded and protected by the same sanctions.” Consol. Fruit Jar Co. v. Wright, 94 U.S. 92, 96, 24 L.Ed. 68 (1876); Moore v. Robbins, 96 U.S. 530, 532, 24 L.Ed. 848 1877. Once a land patent is issued, private disputes involving the patent do not trigger the public rights exception to Article III review. See Moore, 96 U.S. (6 Otto) at 532 (once a patent issues,,“[i]f fraud, mistake, error, or wrong has been done, the courts of justice present the only remedy”); cf. Atlas Roofing Co. v. Occupational Safety & Health Review Comm’n, 430 U.S. 442, 458, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977) (“Our prior cases support administrative factfinding in only those situations involving ‘public rights,’ e.g., where the Government is involved in its sovereign capacity under an otherwise valid statute creating enforceable public rights. Wholly private tort, contract, and property.cases, as well as a vast range of other cases as well are not at all implicated.”). As with land patents, early American third parties could challenge an invention patent’s validity only in courts of equity. See Mowry v. Whitney, 81 U.S. (14 Wall.) 434, 440, 20 L.Ed. 858 (1871). The same was true in England at the time. See Mark A. Lemley, Why Do Juries Decide If Patents Are Valid?, 99 Va. L. Rev. 1673, 1684 (2013) (“[I]n England in the eighteenth century, only chancery courts had the power to revoke a patent upon request of. a private citizen.”).
II. Case Law
A. Murray’s Lessee and McCormick.
Two Supreme Court decisions inform the nature of the patent as a property right and the implications for Article III adjudication. The first decision concerned United States customs agents who embezzled government funds. Murray’s Lessee v. Hoboken Land & Improvement Co., 59 U.S. (18 How.) 272, 15 L.Ed. 372 (1855). To recover the funds, the Treasury Department issued a distress warrant[3] against the agents. In response to the government’s attempt to recover the funds through a non-judicial process, the agents asserted a violation of Article III and the Fifth Amendment. Id. at 275. As a general rule, the Court wrote, Congress may not “withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty.” Id. at 284. But the Court explained an exception:
At the same time there are. matters, involving public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper.
Id. The Supreme Court held that the distress warrant did not violate the Constitution because the matter fell. within the category of public rights. See id. at 283-84. “The point of Murray’s Lessee,” according to a later Court decision, “was simply that *1318 Congress may set the terms of adjudicating a suit when the suit could not otherwise proceed at all.” Stern v. Marshall, 564 U.S. 462, 489, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011). Subsequent discussion of Murray’s Lessee has been critical at times, but it nonetheless remains binding on this court. See, e.g., Wellness Int’l Network, Ltd. v. Sharif, — U.S. —, 135 S.Ct. 1932, 1966-67, 191 L.Ed.2d 911 (2015) (Thomas, J., dissenting) (compiling various interpretations of Murray’s Lessee).
Unlike Murray’s Lessee, the Supreme Court’s 1898 decision in McCormick specifically addressed patents. In McCormick, a patent owner applied to the patent office for a reissue that added several new claims to the existing claims. 169 U.S. at 607, 18 S.Ct. 443. While reviewing the reissue application, the examiner determined that several original claims were invalid. Id. Then, the patent owner abandoned his reissue application and received his original patent back from the examiner. Id. at 607-08, 18 S.Ct. 443. The Supreme Court granted certiorari on whether the original patent included the claims the reissue examiner had determined to be invalid. Id. It held that the examiner had no power to cancel previously issued claims:
It has been settled by repeated decisions of this court that when a patent has received the signature of the secretary of the interior, countersigned by the commissioner of patents, and has had affixed to it the seal of the patent office, it has passed beyond the control and jurisdiction of that office, and is not subject to be revoked or canceled by the president, or any other officer of the government. It has become the property of the patentee, and as such is entitled to the same legal protection as other property.
The only authority competent to set a patent aside, or to annul it, or to correct it for any reason whatever, is vested in the courts of the United States, and not in the department which issued .the patent.
Id. at 608-09, 18 S.Ct. 443 (citations omitted). The Court further stated that:
the reasons given for the rejection of [the added] claims might apply equally to the same claims contained in the original patent, but with respect to such claims [the examiner] was functus offi-cio. His opinion thereon was but his personal opinion, and, however persuasive it might be, did not oust the jurisdiction of any court to which the owner might apply for an adjudication of his rights, and, as the examiner had no authority to affect the claims of the original patent, no appeal was necessary from his decision.... [T]o attempt to cancel a patent upon an application for reissue when the first patent is considered invalid by the examiner would be to deprive the applicant of his property without due process of law, and would be in fact an invasion of the judicial branch of the government by the executive.
Id. at 611-12, 18 S.Ct. 443. The Court wrote in conclusion that “upon the issue of the original patent, the patent office had no power to revoke, cancel, or annul it. It had lost jurisdiction over it, and did not regain such jurisdiction by the application for a reissue.” Id. at 612, 18 S.Ct. 443. Thus, the patent owner’s original claims remained valid and enforceable unless invalidated by an Article III court.
The cases McCormick cites in holding that an executive agency may not cancel issued patents concern the separation of powers and similar constitutional issues. For example, in United States v. Stone, 69 U.S. (2 Wall.) 525, 17 L.Ed. 765 (1864), the Secretary of the Interior “decided that [certain land] patents had been issued without legal authority, and he declared them void and revoked.” Id. at 528 (em *1319 phasis in original). In finding the Secretary’s revocation to be unconstitutional, the Court held that “[a] patent is the highest evidence of title, and is conclusive as against the Government, and all claiming under junior patents or titles, until it is set aside or annulled by some judicial tribunal.” Id, at 535 (emphasis added).
Patents are sometimes issued unadvisedly or by mistake, where the officer has no authority in law to grant them, or where another party has a higher equity and should have received the patent. In such cases courts of law will pronounce them void. The patent is but evidence of a grant, and the officer who issues it acts ministerially and not judicially. If he issues a patent for land reserved from sale by law, such patent is void for want of authority. But one officer of the land office is not competent to cancel or annul the act of his predecessor. That is a judicial act, and requires the judgment of a court.
Id. (emphasis added).
The McCormick Court also cited Moore v. Robbins, 96 U.S. (6 Otto) 530, 24 L.Ed. 848 (1877). In Moore, the Secretary of the Interior reversed a previous grant of a land patent. Id. at 531. While the Court “conced[ed]” that the Land Department may decide land disputes in the first instance, “it is equally clear that when a patent has been awarded to one of the contestants, and has been issued, delivered, and accepted, all right to control the title or to decide on the right to the title has passed from the land-office.” Id. at 532. “Not only has it passed from the land-office, but it has passed from the Executive Department of the government.” Id. (emphasis added).
[A]ny private owner of land who has conveyed it to another can, of his own volition, recall, cancel, or annul the instrument which he has made and delivered. If fraud, mistake, error, or %vrong has been done, the courts of justice present the only remedy. These courts are as open to the United States to sue for the cancellation of the deed or re-conveyance of the land as to individuals; and if the government is the party injured, this is the proper course.
Id. at 533 (emphasis added). The Court noted that the existence of the Land Department’s power to annul issued patents was “utterly inconsistent with the universal principle on which the right of private property is founded.” Id. at 534; see also Mich. Land & Lumber Co. v. Rust, 168 U.S. 589, 595, 18 S.Ct. 208, 42 L.Ed. 591 (1897) (holding that the Land Department may correct mistakes in an earlier survey only “prior to the issue of a patent”); Shepley v. Cowan, 91 U.S. (1 Otto) 330, 340, 23 L.Ed. 424 (1875) (“If [Land Department officers] err in the construction of the law applicable to any case, or if fraud is practiced upon them, or they themselves are chargeable with fraudulent practices, their rulings may be reviewed and annulled by the courts when a controversy arises between private parties founded upon their decisions.”).[4]
B. Patlex and MCM
McCormick is the law of the land. Yet, this court has twice considered McCormick and twice declined to follow it for two distinct but conflicting reasons. In my view, that two of our precedential opinions address McCormick in such irreconcilable terms alone warrants an en banc review.
*1320 In .1985, a three-judge Federal Circuit panel held that Congress’s 1980 reexamination statute did not violate Article III. Patlex, 758 F.2d at 605. The appellant in Patlex argued that, his Article III “rights were part of the bundle of property rights that accompanied the grant of his patents, and thus that the retroactive scope of reexamination worked a prohibited deprivation.” Id. at 603. The panel disagreed. It wrote that .the Supreme Court’s decision in McCormick established “on constitutional grounds that an applicant for a reissue patent need not acquiesce in any finding of invalidity or unpatentability by the reissue exam'iner[ and] affirmed that an issued patent could not be set aside other than by an Article III court,” Id. at 604. Nevertheless, the ’ Patlex panel distinguished McCormick based on congressional intent to provide authority for reexaminations while retaining reissue proceedings. Id,
" The purpose of reissuance of patents is "to enable correction of errors made'by the inventor, at the initiative of the inventor. The reexamination statute’s purpose is to correct errors made by the government, to remedy defective governmental (not private) action, and if need be to remove patents that should never have been granted. We do not read McCormick [] as forbidding Congress to authorize reexamination to correct governmental mistakes, ■ even against the will of the patent owner. A defectively examined and therefore erroneously granted patent must yield to the reasonable Congressional purpose of facilitating the correction' of governmental mistakes. This Congressional purpose is presumptively correct, and we find that it carries no insult to the Seventh Amendment and Article III.
Id. The losing party in Patlex did not petition the .Supreme Court for a writ of certiorari.
Three decades later, a three-judge panel held that inter partes review (“IPR”) proceedings do not violate Article III. MCM Portfolio LLC v. Hewlett-Packard Co., 812 F.3d 1284, 1292 (Fed. Cir. 2015). The panel “s[aw] no basis to distinguish the reexamination proceeding in Patlex from inter partes review,” because “Congress viewed inter partes review ás ‘amendfing] ex parte and inter partes reexamination.’” Id. at 1291 (quoting H.R. Rep. No. 112-98, 2011 U.S.C.CA.N. 67, 75, at 45).
Beyond approving (and extending) Pat-lex, the MCM panel made two significant legal conclusions. First, it stated that McCormick was decided on statutory, rather than constitutional, grounds. See id. at 1289 (characterizing McCormick’s holding as depending on the lack of “statutory authorization”). According to the MCM panel, McCormick “did not address Article III and certainly did pot forbid Congress from granting the PTO the authority to correct or cancel an issued patent.” Id.
Second, the MCM panel explicitly found for the first time that “patent rights are public rights.” Id, at 1293. As a basis for its finding, the panel noted that “[t]he patent right ‘derives from an . extensive federal regulatory scheme’, and - is created by federal law,” Id. at 1290 (quoting Stern, 564 U.S. at 490, 131 S.Ct. 2594). In addition, “Congress created the PTO, ‘an executive agency with specific authority and expertise’ in the patent law.” Id. (quoting Kappos v. Hyatt, 566 U.S. 431, 132 S.Ct. 1690, 1696, 182 L.Ed.2d 704 (2012)). According to MCM, because there is “no suggestion that Congress lacked the authority to delegate to the PTO- the power to issue patents, ... [i]t would be odd indeed if Congress could not authorize the PTO to reconsider its own decisions.” Id. at ,1291.[5]
*1321 Like Patlex, the panel decision in MCM was never subject to en banc review. Instead of petitioning for rehearing en banc, the losing party in MCM petitioned the Supreme Court for a writ of certiorari. That petition was denied. See — U.S. —, 137 S.Ct. 292, 196 L.Ed.2d 212 (2016). Thus, we have not yet considered as a full court Article Ill’s .constraints on the Patent Trial and Appeal Board’s (“Board”) power to cancel originally issued patents.[6]
C. Cascades
In 2015, Epson America, Inc. (“Epson”) and Sony Corp. (“Sony”) separately petitioned for IPR of Ü.S, Patent No. 7,688,-347 (“’347 patent”). The Board instituted both proceedings. Cascades Projection LLC (“Cascades”) argued in the Sony proceeding that Article III prohibited the Board from canceling patents. The Board issued Final Written Decisions finding certain claims of the ’347 patent to be unpat-entable. In the Sony Final Written Decision, the Board correctly acknowledged that it “lacks authority to rule on the constitutional questions.” Sony Corp. v. Cascades Projection LLC, No. IPR2015-01846, Dkt. No. 32, at 34-35 (P.T.A.B. Jan. 11, 2017).[7]
Cascades appeals only the issue of whether Article III prohibits the Board from canceling patent claims. It recognizes that it cannot prevail on appeal if MCM remains good law. Because a three-judge panel cannot overrule a precedential opinion, Cascades seeks initial rehearing en banc. We have jurisdiction under 28 U.S.C. § 1295(a)(4)(A) to address the constitutional issues.
III. En Bang Action Is Necessary
The Federal Circuit internal operating procedures provide for taking en banc action upon: (a) necessity of securing or maintaining uniformity of decisions; (b) involvement of a question of exceptional importance; and (c) necessity of overruling a prior holding of our court. Fed. Cir. Internal Operating Procedure #13(2); Fed. R. App. P. 35(a); Sony Elecs., Inc. v. United States, 382 F.3d 1337, 1339 (Fed. Cir. 2004) (per curiam). Any one of these reasons is sufficient to justify en banc action. At least the first two are, satisfied here.
A. Panel Decisions Not Uniform
Our panel decisions holding that McCormick does not prohibit patent claim, cancellation by non-Article III forums are not uniform. To the contrary, Patlex and MCM diverge on the approach taken to avoid the plain language of McCormick.
Patlex and MCM are unequivocal. Pat-lex stated that McCormick’s holding was “established] on constitutional grounds.” 758 F.2d at 604. Moreover, the Patlex panel wrote that McCormick “affirmed that'an issued patent could not be set aside other than by an Article III court.” Id. Contrary to Patlex, the MCM panel characterized McCormick as a statutory" case. It framed the unlawful patent invalidation in McCormick as “[without statutory authorization.” MCM, 812 F.3d at 1289. And it wrote that McCormick “did not addréss *1322 Article III and certainly did not forbid Congress from granting the PTO the authority to correct or cancel an issued patent.” Id.
What Patlex and MCM hold in common is a conclusion that reexaminations - and IPRs, respectively, do . not violate Article III. They both distinguish binding . Supreme Court precedent, but they do so in distinct and incompatible ways. As a court of appeals, we have no discretion to distinguish Supreme Court precedent solely to avoid its holdings. At minimum, if we determine in two separate actions that a Supreme Court holding does not apply, our rationale must be uniform. Because it is not, and because the divergent rationales in Patlex and MCM are outcome-determinative, we should have granted Cascades’ petition.
B. An Exceptionally Important Question
There are two primary reasons why Cascades’ petition is exceptionally important. First, the issue before us invokes the separation of powers—a fundamental constitutional safeguard. Second, it is incumbent upon us to address the private-versus-public right distinction as it relates to patents.[8] Both of these issues require us to review the IPR process in the context of the constitutional role of Article III courts.
1. Separation Of Powers
Congressional delegation of judicial power to non-Article III entities compromises Article Ill’s “purpose in the system of checks and balances” and “the integrity of judicial decisionmaking.” Stern, 564 U.S. at 484, 131 S.Ct. 2594. James Madison considered the “separation of] the Legislative, Executive,- and Judicial powers” to be a principle “more sacred than any other.” 1 Annals of Cong. 581 (1789). Since the earliest years of our nation, the Supreme Court has agreed. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) (“It is emphatically the province and duty of the judicial department to say what the law is."); Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 60, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (plurality opinion) (“[0]ur Constitution unambiguously enunciates a fundamental principle—that the ‘judicial Power of the United States’ must be reposed in an independent Judiciary. It commands that the independence of the Judiciary be jealously guarded, and it provides clear institutional protections for that independence.”). The judicial power of Article III is not to be shared with other branches of government. United States v. Nixon, 418 U.S. 683, 704, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); see also Stern, 564 U.S. at 483, 131 S.Ct. 2594 (the judiciary must be “truly distinct from both the legislature and the executive”) (quotation marks and citation omitted).
Ever since the Supreme Court declared that the judiciary is the only branch of government empowered “to say what the law is,” Marbury, 5 U.S. (1 Cranch) at 177, Article III courts have witnessed Congress transfer more and more of their authority to other tribunals. Madison' warned that “the Legislature would inevitably seek to draw greater power into its ‘impetuous vortex.’ ” Wellness, 135 S.Ct. at 1960 (Roberts, C.J., dissenting) (quoting The Federalist No. 48, p. 309 (James Madison) (C. Rossiter ed. 1961) (1788)); id. (“[S]teady erosion of Article III authority, no less than a brazen usurpation, violates the constitutional separation of powers.”); see also Buckley v. Valeo, 424 U.S. 1, 129, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).
*1323 While Congress has established federal courts under Article III, it also has established several tribunals outside of Article III. Without a doubt, these able and hard-working administrative law judges allow the judiciary to keep up with its massive docket. But I find the trend of efficiency-over-constitutionality to be troubling and in need of a clear limiting principle. See Crowell v. Benson, 285 U.S. 22, 56-67, 52 S.Ct. 285, 76 L.Ed. 598 (1932) (“The recognition of the utility and convenience of administrative agencies for the investigation and finding of facts within their proper province, and the support of their authorized action, does not require the conclusion that there is no limitation of their use....”). These tribunals lack the protections of Article III courts, in particular, the Seventh Amendment’s guarantee of a jury. We should be always wary of pawning Article III for the immediate relief of efficiency.
2. Patents As Private Rights
A fundamental rule of our system of government is that judicial power belongs in the judiciary, as defined by Article III. See Marbury, 5 U.S. (1 Cranch) at 177; N. Pipeline, 458 U.S. at 60, 102 S.Ct. 2858 (plurality opinion); Nixon, 418 U.S. at 704, 94 S.Ct. 3090; Stern, 564 U.S. at 483, 131 S.Ct. 2594. That rule, however,, is not absolute. The Supreme Court has recognized three exceptions: (1) territorial courts; (2) courts-martial; and (3) adjudication of public rights. See N. Pipeline, 458 U.S. at 71, 102 S.Ct. 2858; Stern, 564 U.S. at 505, 131 S.Ct. 2594 (Scalia, J., concurring). The first two exceptions are not at issue in this case.
In 1765, William Blackstone contrasted the three “absolute” rights of life, liberty, and property to public rights, which belonged to “the whole community, considered as a community, in its social aggregate capacity.” Wellness, 135 S.Ct. at 1965 (Thomas, J., dissenting) (quoting William Blackstone, 1 Commentaries *119 and 4
Commentaries *5). Early examples of public rights included transportation rights and general regulatory compliance. Spokeo, Inc. v. Robins, — U.S. —, 136 S.Ct. 1540, 1551, 194 L.Ed.2d 635 (2016) (Thomas, J., concurring) (citation omitted). Normally only the government could vindicate a public right; private individuals could sue for violations of public rights only in rare cases upon showing extraordinary harm. Id.
The Supreme Court first invoked the public rights doctrine' in Murray’s Lessee. There, the Court held that Congress may not “withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty.” 59 U.S. at 284. But the Court provided an exception for public rights:
At the same time there are matters, involving' public rights, which may be presented in such form that the judicial power is capable of acting bn them, and which are susceptible of judicial determination, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper.
Id. Only later did the Supreme Court explain the constitutional justification,for the public rights exception: sovereign immunity.
[Claims against the United States] may arise in many ways and may be for money, lands, or other things. They all admit of legislative or executive determination, and' yet from their nature are susceptible of determination by courts; but no court can have cognizance of them except as Congress makes specific .provision therefor. Nor do claimants have any right to sue on them unless Congress consents; and Congress may attach to its consent such conditions as it deems proper, even to requiring that the *1324 suits be brought in a legislative court specially created to consider them.
Ex parte Bakelite Corp., 279 U.S. 438, 452, 49 S.Ct. 411, 73 L.Ed. 789 (1929).
Three' years after Bakeligkt, the Supreme Court decided Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932).- Drawing on historic practice and the benefits of efficiency, the Court found that certain agency factfinding in admiralty cases, even if preclusive, did not violate Article III. Id. at 51-54, 52 S.Ct. 285. The Court emphasized, the statute’s “limited application” to legislative facts only; an Article III judge was required to review jurisdictional facts. Id. at 53,-52 S.Ct. 285. As the Court warned, “Congress cannot reach beyond the constitutional limits which are inherent in the admiralty and maritime jurisdiction.” Id. at 55, 52 S.Ct. 285. It went on:
The recognition of the utility and convenience of administrative agencies for the investigation and finding of facts within -their proper province, and the support of their authorized action, does not require the conclusión that there is no limitation of their use, and that the Congress could completely oust the courts of all determinations of fact by vesting the authority to make them with finality in its own instrumentalities or in the executive department. That would be to sap the judicial power as it exists under the federal Constitution, and to establish a government of a bureaucratic character alien to our system, wherever fundamental rights depend, as not infrequently they do depend, upon the facts, and finality as to facts be-comes in effect finality in law.
Id. at 56-57, 52 S.Ct. 285. Finally, Crowell held that “the judicial power of the United States necessarily extends to the independent determination of all questions, both of fact and law, necessary to the performance of th[e] supreme function” of enforcing constitutional rights. Id. at 60, 52 S.Ct. 285.
In 1982, the Supreme Court decided Northern Pipeline, holding that bankruptcy courts (as then constituted) violated Article III. 458 U.S. at 87, 102 S.Ct. 2858. A plurality of the Court announced “two principles that aid us in determining the extent to which Congress may constitutionally vest traditionally judicial functions in non-Art[icle] III officers.” Id. at 80, 102 S.Ct.. 2858. “First, it is clear that when Congress creates a substantive federal right, it possesses, substantial discretion to prescribe the manner in which that right may be adjudicated—including the assignment to an adjunct of some functions historically performed by judges.” Id. “Second, the functions of the adjunct [decisionmaker] must be limited in such a way that ‘the essential attributes’ of judicial power are retained in the Article] III court.” Id. at 81, 102 S.Ct. 2858. When constitutional rights- are at stake, the Court explained, “substantial inroads into functions that have traditionally been performed by the Judiciary cannot be characterized merely as incidental extensions of Congress’ power to define rights that it has created.” Id. at 84, 102 S.Ct. 2858. Because the Bankruptcy Reform Act of 1978 “impermissibly removed most, if not all, of ‘the essential attributes of the judicial power’” from Article III courts, it was unconstitutional. Id. at 87, 102 S.Ct. 2858.
The Supreme Court further noted that a fundamental reason to exclude public rights from Article III is “the traditional principle of sovereign immunity, which recognizes that the Government may attach conditions to its consent to be sued.” Id. at 67, 102 S.Ct. 2858. In other words, “ ‘public rights’ are those matters involving disputes between an entity and the federal government to which sovereign immunity *1325 applies, such that Congress need not have permitted the lawsuit in the first place.” Michael P. Goodman,, Taking Back Takings Claims: Why Congress Giving Just Compensation Jurisdiction To The Court Of Federal Claims Is Unconstitutional, 60 Vill. L. Rev. 83, 100 (2016). In my view, veterans benefits eases, Social Security cases, and claims against the United States in the Court of Federal Claims all involve a waiver of sovereign immunity and, in one form or the other, generally involve a private party asserting claims against the government. But query whether patents fit this category. No one sues the government to invalidate a third party’s patent, for the patent is property of the patent owner.
The Supreme Court has acknowledged that its “discussion of the public? rights exception ... has not been entirely consistent, and the [public rights] exception has been the subject of some debate.”' Stern, 564 U.S. at 488, 131 S.Ct. 2594. But the Court in recent years has given, us some guide-posts. The public rights exception is not limited to actions where the government is a party, Stern, 564 U.S. at 490, 131 S.Ct. 2594, despite the objection of at least one justice, id. at. 503, 131 S.Ct. 2594 (Sea-lia, J., concurring) (“I adhere to my view, however, that—our contrary precedents notwithstanding—a matter of public rights must at minimum arise between the government and others....”) (quotation marks, alteration, and citation omitted). The exception is limited, however, “to cases in which the claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert government agency is deemed essential to a limited regulatory objective within the agency’s authority.” Id. at 490, 131 S.Ct. 2594 (majority opinion). Put another way, “what makes a right ‘public’ rather than private is that the right is integrally related to particular federal government action.” Id. at 490-91, 131 S.Ct. 2594. Despite this recent guidance from Stem, “the contours of the ‘public rights’ doctrine have been the source of much confusion and controversy.” Wellness, 135 S.Ct. at 1964-65 (Thomas, J., dissenting). The confusion continues. Lending to the confusion is the apparent conviction of some that the patent is a child, born and nurtured, of a federal regulatory scheme. I believe that the patent derives, its characteristics indelibly secured, from a greater parent, the United States Constitution.
It is essential, therefore, to clarify the line between public and private rights. Under current Supreme Court precedent, that line remains hazy, in particular in connection with patent rights. Yet, as the administrative state expands and non-Article III tribunals adjudicate more disputes under the cover of the public rights doctrine, there must be vigilance in protecting Article, III jurisdiction. Each new tribunal outside of Article III should be greeted with skepticism. Rigorously defending Article Ill’s protections is among our most important duties, for there exists no other voice to guard against legislative and executive excess.[9]
IV. Conclusion
By its inaction today, the court ignores ■the plain language of binding Supreme Court precedent. It ignores whether to continue to allow a 2-year-old panel decision to supplant a 120-year-old Supreme Court holding, and it overlooks an irreconcilable divide in our panel decisions. The relationship between patent statutes and *1326 constitutional provisions is an exceptionally important issue this court, in particular, should address.
The Board’s cancellation of patents through inter partes review may be the type of agency activity that “sap[s] the judicial power as it exists under the federal Constitution” and “establish[es] a government of a bureaucratic character alien to our system.” Crowell, 285 U.S. at 57, 52 S.Ct. 285. Or, it may not. It is a question we should address.
I respectfully dissent.

. For more detail, see Adam Mossoff, Patents as Constitutional Private Property: The Historical Protection of Patents under the Takings Clause, 87 B.U. L. Rev. 689, 700-11 (2007).

. A land patent is ”[a]n instrument by which the government conveys a grant of public land to .a private person,” Land Patent, Black’s Law Dictionary (10th ed. 2014).

. A distress "warrant authorizes a court officer • ■ to seize property as payment for money owed. Distress Warrant, Black!s Law Dictionary (10th ed. 2014).

. This, of course, portends difficulties for agencies other than the United States Patent and Trademark Office ("PTO”), such as the United States International Trade Commission ("ITC”), which does not administer or grant patents yet often acts to annul them. See, e.g., Lannom Mfg. Co. v. ITC, 799 F.2d 1572, 1574 (Fed. Cir. 1986) (ITC finding of patent invalidity).

. See supra note 4.

. Though the Supreme Court denied the petition for writ of certiorari in MCM, it askéd for the PTO’s views on this issue (and two others) in Oil States Energy Services v. Greene's Energy Group, No. 16-712. In Oil States, the patent owner did not raise an Article III challenge before the Board. The patent owner argued before the Federal Circuit that IPR proceedings violate Article III, but MCM was decided during the Oil States appeal. A Federal Circuit panel summarily affirmed Oil States using its Rule 36 affirmance procedure. See Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC, 639 Fed.Appx. 639 (Fed. Cir. 2016).

. It appears Cascades did not raise a constitutional argument in the Epson IPR,

. Moreover, if patents are private rights, the Board's cancellation of original patent claims should cease. Obviously, a decision on these issues could implicate areas of law beyond patents. ■

. I note that a recent Board decision interpreted the Eleventh'Amendment of the United States Constitution.' See Covidien LP v. Univ. of Fla. Research Found. Inc., No. IPR2016-01274, Paper 19 (Order Dismissing Petitions for Inter Partes Review Based on Sovereign Immunity) (P.T.A.B. Jan. 25, 2017).